IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 21, 2018 Session

**IN RE DAMON B., ET AL.**

**Appeal from the Circuit Court for Gibson County**
**No. 8885     Clayburn Peeples, Judge**
_____

**No. W2017-01858-COA-R3-PT**
_____

Parents appeal the termination of their parental rights to their two minor children. The children came into the custody of the Department of Children's Services ("DCS") after receiving a referral of domestic violence and subsequent concerns raised about the parents' drug abuse and mental health. The children were adjudicated dependent and neglected in juvenile court. Several permanency plans were developed and monitored by DCS, all of which listed goals of good mental health, a safe environment free from domestic violence, and a drug free home. DCS filed a petition in circuit court to terminate the parents' rights to the children on grounds of (1) abandonment by failure to provide a suitable home as to both parents; (2) abandonment by incarcerated parent as to Father; (3) substantial noncompliance with permanency plan as to both parents; and (4) persistence of conditions as to both parents. A guardian ad litem was appointed to represent the children in both the juvenile court dependency and neglect case and the circuit court termination case. The guardian ad litem filed a motion in juvenile court to modify the parents' visitation, based in part on her personal observations. Father filed motions to disqualify the guardian ad litem in both juvenile and circuit court, asserting that the guardian ad litem began functioning as a necessary witness. The juvenile court granted the guardian ad litem's motion to modify the parents' visitation and denied the father's motion to disqualify the guardian ad litem, specifically noting in its ruling that the court excluded any personal observations by the guardian ad litem. Thereafter, the circuit court also denied the father's motion to disqualify the guardian ad litem, holding that the guardian ad litem was not a "necessary witness" as required under Tennessee Supreme Court Rule 8, Rule of Professional Conduct 3.7(a). Following a trial, the circuit court found that DCS had proven the grounds of abandonment for failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistence of conditions, and that termination was in the children's best interest. Based on these findings, the circuit court terminated both parents' parental rights. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the court, in which BRANDON O. GIBSON and JOHN EVERETT WILLIAMS, JJ., joined.

Harold R. Gunn, Humboldt, Tennessee, for the appellant, Jamie W.[1]

Alexander D. Camp, Jackson, Tennessee, for the appellant, Michael B.

Betty S. Scott, Medina, Tennessee, Guardian Ad Litem for Damon B. and Elijah B.

Herbert H. Slatery, III, Attorney General and Reporter; and W. Derek Green, Assistant Attorney General, for the Tennessee Department of Children's Services.

## OPINION

Jamie W. ("Mother") and Michael B. ("Father") are the unmarried parents (collectively, "Parents") to two minor children, Damon and Elijah B. In May 2015, Father contacted DCS, alleging that Mother had attempted to shoot Father and that Parents were unable to care for the children due to Mother's psychological issues and Father's physical ailments. During DCS's subsequent investigation, Parents reported multiple instances of domestic violence. Law enforcement had been called on the family over ten times during the previous two years, resulting in seven arrests and Father's conviction for domestic assault in February 2015. Parents admitted to an extensive history of substance abuse and currently using marijuana and cannabis oil to treat chronic health conditions.[2] Parents also reported having untreated mental health issues; Father allegedly had PTSD, and Mother reported a history of suicide attempts.

In late May 2015, DCS began in-home family counseling after Parents admitted that they needed assistance. Due to Father's comments about wanting to kill or poison Cody, Mother's oldest child from a previous relationship, Parents agreed that the children's safety required Father to leave the home; however, Mother later notified DCS that Father refused to leave and would not allow her to leave either. Because of Parents'

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] Both Mother and Father suffer from Hepatitis C, which is

> a liver infection caused by the Hepatitis C virus . . . Today, most people become infected with the Hepatitis C virus by sharing needles or other equipment to inject drugs. For . . . 70%–85% of people who become infected with Hepatitis C, it becomes a long-term, chronic infection . . . [that] is a serious disease than [sic] can result in long-term health problems, even death.

Centers for Disease Control and Prevention, Viral Hepatitis, https://www.cdc.gov/hepatitis/hcv/index.htm, (last visited June 15, 2018).

issues with domestic violence, drug use, and mental health concerns, the children were removed into DCS custody on July 2, 2015. Two weeks later, then five-month-old Elijah tested positive for marijuana. In an order entered on September 16, 2015, the juvenile court adjudicated the children dependent and neglected.

On November 1, 2016, DCS filed a petition in circuit court to terminate Parents' rights to the children, on grounds of (1) abandonment by failure to provide a suitable home as to both Parents, (2) abandonment by incarcerated parent as to Father, (3) substantial noncompliance with permanency plan as to both Parents, and (4) persistence of conditions as to both Parents. Trial was held July 28, 2017, before the Gibson County Circuit Court, where numerous witnesses testified.

Tracy White was the child protective service worker with DCS assigned to investigate the family's case when it was initially reported in May 2015. According to Ms. White's testimony, Father initially contacted DCS with concerns about his children. Ms. White stated that, in Father's words, "the children would be better off in the State's custody than with [Mother]," and that Father was "currently afraid to leave them in [Mother's] care." During her initial interview with Parents in May 2015, Ms. White testified that both Mother and Father admitted they had a history of drug use, and Father described himself as a former "crack head." Both Parents agreed to submit to an initial drug screen which came back positive for marijuana and opiates. Ms. White testified that then five-month-old Elijah also tested positive for marijuana.

Ms. White further stated that Parents reported several instances of domestic violence to her, including "physical violence and threatening with knives and guns" with the most recent incident occurring on May 22, 2015. Ms. White testified that Parents described the incident as police responding to a "physical altercation" between Father and Cody – during which Mother brandished a knife and threatened to stab Father if he hurt her son. Cody reported that Father was the primary aggressor. Ms. White confirmed that the two younger children were present during this incident. Ms. White described another incident where Father slapped and threw a mug at Mother while she held Damon, shattering glass over Mother and child. Parents admitted to Ms. White that theirs was "not a healthy home situation." Father wanted Mother to get psychological help, and Father believed he needed medical treatment for his Hepatitis C. Parents told Ms. White they would need assistance with the children in order for that to happen. Ms. White set up counseling services for Parents and coordinated services through DCS for Damon, who was developmentally delayed.

By June 2015, conditions with Mother and Father had not improved. When Ms. White went to meet with them, "they both agreed that the two of them together was not a safe environment for the children." Ms. White discussed with Mother and Father how they could keep their children safe and allow the children to remain in Parents' custody. Initially, the plan was for Father to move out. However, Ms. White testified that Mother

reported to DCS that Father "was not gonna leave" and "wouldn't let her leave if she tried," and so on July 2, 2015, the children were removed into DCS custody. Following DCS protocol, Ms. White's involvement with the case ended once the children were removed from the home.

Stephanie Richardson was the case worker assigned when the children came into DCS custody. She worked with the family from July 2015 to April 2017. Ms. Richardson testified that domestic violence, substance abuse, and mental health concerns were the issues that brought the children into DCS custody. Ms. Richardson helped to develop a permanency plan with Parents, which is a contract outlining responsibilities and goals for Mother and Father to achieve, with the end goal in this case aiming to reunify Parents with their children. Ms. Richardson testified that initially, the permanency plan specified that Parents pay child support; they were asked to maintain a safe and stable home for the children and asked to visit regularly with the children; Parents were asked to complete mental health intakes and follow through with any recommendations such as counseling; they were asked to attend counseling to specifically address domestic violence; they were also asked to complete an alcohol and drug assessment and any recommended treatment as well as comply with random drug screens; and finally, they were asked to refrain from illegal drug use and domestic violence.

In July 2015, the children were placed in custody with the foster parents and began having bi-monthly supervised visits with Parents.

During a visit in January 2016, Ms. Richardson testified that DCS called law enforcement after Father, "crying and cursing," got into the foster parents' car with the children and refused to leave. Ms. Richardson stated that the foster mom came back into the building to explain what was going on and told Ms. Richardson that she was scared and didn't know what to do. The permanency plan was revised later that month to forbid Father from putting the children in the car after visits. It also added that Parents refrain from discussing the case with the children and required Parents to complete a psychological evaluation with a parenting component and follow recommendations. At that time, Parents had begun parenting classes, and Mother had one class left to complete.

Parents completed their mental health intakes in August 2015 and reported to DCS that they attended counseling from August to December 2015. However, in January 2016, Ms. Richardson learned that Mother had actually only been to one counseling appointment and Father had two or three appointments. The counseling center had also permanently discontinued services for Father due to his multiple absences. In June 2016, Ms. Richardson followed up with a new counselor Father was seeing and learned that Father failed to mention his domestic violence issues to the counselor, focusing exclusively on his perceived health problems instead.

- 4 -

Ms. Richardson met regularly with Mother and Father to discuss their progress in reaching the goals of the permanency plans. Ms. Richardson testified that since the children came into DCS custody, Parents were asked to complete ten to twelve drug screens. In that time, Mother had one negative drug screen, all of Father's were positive, and both Parents refused to submit to drug screens on multiple occasions. In Ms. Richardson's professional opinion, Parents have not accomplished goals in the permanency plan to create an environment in which she felt it was reasonably safe to return the children to Parents' custody. Specifically, Ms. Richardson testified that neither parent has consistently attended counseling or addressed their drug and alcohol issues.

William Beyer is a licensed senior psychological examiner, health service provider, and licensed professional counselor. Mr. Beyer testified that on March 30, 2016, at the request of DCS, he performed a psychological evaluation with an assessment component on each of Parents. Mr. Beyer testified that in performing these types of evaluations, he has very little access to outside information and had to rely solely on what Mother and Father disclosed to him.

Mr. Beyer testified that Mother reported "significant conflicts" in her relationship with Father with "pretty bad episodes" of domestic violence after the children were born, but she insisted that it "never got physical after that." Mother indicated to Mr. Beyer that her relationship with Father "had been quite chaotic and that she was making some attempt to kind of separate herself from him." Mr. Beyer's testimony highlighted a few key points where Mother was not entirely forthcoming in her evaluation. Mr. Beyer stated that Mother never told him that she had already lost custody of two other children, nor did Mother disclose that she filed several orders of protection against Father in their ongoing issues with domestic violence. And while Mother admitted to testing positive for marijuana after a trip to Colorado, she did not disclose to Mr. Beyer that she tested positive for codeine in November 2015 or for methamphetamine in February 2016.

Mr. Beyer diagnosed Mother with major depressive disorder, generalized anxiety disorder, and PTSD. He explained that Mother suffered from "learned helplessness," where "a long pattern of abuse" causes a person to feel incapable of "being assertive or escaping." Mr. Beyer recommended that Mother receive trauma-focused counseling and stressed that it was critical for her to remain free from alcohol and drugs. Mr. Beyer further recommended that Mother remain under psychiatric care in order to address her anxiety and depression, which are illnesses that "can become progressively worse over time and further impair decision making." Mr. Beyer opined that moving away from Father – whose personality would create ongoing conflicts in raising the children – would be an important step in establishing appropriate boundaries. At the time of his evaluation, Mr. Beyer testified that Mother and Father's relationship did not seem healthy because of a pattern of conflict between the two.

Mr. Beyer testified that Father was "very fervent" in his discussions about having Hepatitis C, how cannabis oil played a significant role in his health, and that it was a cure for Hepatitis C. Throughout his interview with Father, Mr. Beyer stated that he would ask Father a question, and it would repeatedly lead back to Father's Hepatitis C and his use of cannabis oil. Mr. Beyer testified that he had to redirect Father to stay on topic. Mr. Beyer's testimony showed that Father was likewise not entirely honest during the evaluation. Mr. Beyer testified that while Father acknowledged using alcohol only prior to the children's birth, he claimed to have prescriptions for benzodiazepines and oxycodone and otherwise denied a history of drug use. Father never disclosed to Mr. Beyer that he had a history of addiction treatment. When asked about Elijah testing positive for THC or marijuana in 2015, Father told Mr. Beyer that the only way Elijah could have tested positive for the drug was that Father must have transferred some cannabis oil residue from his finger onto a baby bottle while cleaning it.

Regarding domestic violence, Father reported to Mr. Beyer that Mother slapped him and would sometimes call the police on him, but Father denied any domestic violence since the children's birth or that his arguments with Mother were ever physical. However, Mr. Beyer also testified that Father admitted calling DCS in 2015 with concerns that his children might suffer "due to the unresolved problems between [Mother] and [Father]." When Mr. Beyer asked Father about his prior criminal history, Father mentioned having one criminal charge "during the time [he] was at [his] sickest," but neglected to disclose his other arrests for assault, aggravated assault, vandalism, and DUI.

Noting that Father found difficulty accepting responsibility, Mr. Beyer diagnosed Father with a histrionic personality disorder, potentially overlapping with narcissistic personality. Mr. Beyer opined that treatment would be difficult because personality disorders are "very difficult to overcome" even over a "long time span of intensive counseling," and those with a histrionic personality disorder in particular are "not ... willing to entertain alternative viewpoints … tend[ing] to place blame on the other individuals for their own failings or shortcomings." But Mr. Beyer felt that treatment would not be impossible, adding that Father would need to work on controlling his frustration and his temper, as "his ability to work effectively with [Mother] and DCS will hinge on his ability to demonstrate self-control even when he disagrees with others."

The permanency plan was revised in April 2016 to add the specific treatment recommendations of Mother and Father's psychological evaluations with Mr. Beyer. Mother's additional action steps required that she complete therapy to address her depression and PTSD and remain under the care of a psychiatrist. Father's additional action steps required that he complete counseling to address grief and loss and controlling his frustration and temper. Due to Father being "verbally aggressive" toward the foster parents, the team also decided that Father would participate in Child and Family Team Meetings by phone.

In May 2016, Father moved next door to Mother's home in the public housing complex where she lived after the children's removal. The following month, Mother obtained a year-long order of protection against Father, alleging that he had threatened her and her brother-in-law with a rifle.

David French, a foster care counselor with Youth Villages, began supervising the children's visits with Father in the summer of 2016 because the foster parents no longer felt comfortable doing it themselves. Mr. French described multiple incidents during which Father became irrational, volatile, and loud during visitations. Mr. French testified that Father refused to exit the foster parents' vehicle on multiple occasions and sometimes became "verbally aggressive" with the foster parents. Mr. French stated that Father's behavior made the children "fearful" during visits and especially upset after they were over. Both children experienced diarrhea on the way to and from visits, and Mr. French testified that they would not fall into a normal routine or behavior for several days, during which Damon would bang his head on the floor and walls. Mr. French testified that he recommended that Father's visitation be stopped "due to the nature of the trauma it was creating for the children."

The permanency plan was again revised on June 30, 2016. It added that Parents participate in services with Youth Villages to address positive parenting skills and emphasized that they resume the parenting classes that they had nearly completed.

In August 2016, the juvenile court found that Father was refusing drug screens, attending counseling only inconsistently, and that he had been "increasingly non-compliant with [DCS]." That same month, Father was incarcerated for ten days for violating the order of protection after Mother gave him a ride to court.

Shortly before DCS petitioned to terminate Mother's and Father's parental rights on November 1, 2016, Parents resumed counseling. Mother inconsistently saw Sonya Goodrich to address Mother's past trauma, PTSD, domestic violence issues, and drug use. While Mother had domestic violence issues with others, Ms. Goodrich found that Father "was a big part" of the significant trauma Mother had experienced throughout her life. Ms. Goodrich testified that Mother disclosed "severe beatings" by Father prior to the children's birth as well as more recent incidents of domestic violence. In March 2017, Mother reported to Ms. Goodrich that Father was harassing and stalking her. Mother also claimed that she had quit using drugs and was passing her drug screens, which Ms. Goodrich later discovered was a lie. In actuality, during the timeframe Mother was seeing Ms. Goodrich, from October 2016 to April 2017, Mother refused three drug screens and tested positive for methamphetamine, amphetamine, and marijuana. Ms. Goodrich ultimately reported to DCS that Mother did not complete any of her treatment goals.

On a referral from Ms. Richardson to address the ongoing domestic violence, Father met with licensed therapist Alvin Bonds approximately six to eight times between October 2016 and July 2017. Mr. Bonds focused his treatment on anger management and diagnosed Father with severe cannabis use disorder, noting that marijuana was not appropriate for Father to use while parenting due to its "detrimental" effect on a parent's faculties and ability to focus. When asked whether Father was willing to stop using cannabis oil or marijuana, Mr. Bonds testified that Father's response was, "not at this time."

In November 2016, Ms. Richardson set up an appointment for both Parents to address domestic violence issues with Mr. Bonds. Mr. Bonds testified that neither parent reported any physical violence. Father explained to Mr. Bonds that the children were removed due to lead poisoning and "consistent turmoil" between himself and Mother. Father failed to disclose that the police had been called during his arguments with Mother or that he had multiple charges for domestic assault in the previous four years, including one conviction after the children were born. Neither Parent disclosed to Mr. Bonds that Elijah had tested positive for marijuana, and while Father was very open about his cannabis oil and marijuana use in treating his Hepatitis C, Father failed to report that he had also tested positive for methamphetamine in June 2017. Mr. Bonds stated that Father denied any substance abuse and denied any physical aggression towards Mother. Mr. Bonds observed that Mother and Father's relationship is "definitely one that is unhealthy, so it is a positive thing they are separated and no longer together."

The foster mom testified that the children have been with her and her husband for a little over two years. She explained that Damon was developmentally delayed when he initially came into their custody but testified that now both boys are above average. The foster mom described behavioral incidents with the children after visits with Mother and Father. She stated that the children were "very violent and would hit each other," they would get in trouble at school, and would complain of having stomachaches and diarrhea. This was consistent after visits with Parents; however, after the juvenile court suspended visits with Parents, the foster mom said there was a noticeable improvement in the children's behavior. She testified that Mother admitted being fearful of Father being around the children, that Mother told the foster mom she would never leave the children alone with Father, and that Mother admitted she was scared of Father because he wouldn't leave her alone. The foster mom admitted she also had safety concerns for herself and the children regarding Father. The foster mom testified that she and her husband love the children and have developed a strong bond with them. If given the opportunity, they would adopt the children "[i]n a second."

Father testified that he did everything he felt he could do in order to regain custody of his children, stating he "went above and beyond" what DCS asked him to do in completing goals of the permanency plans. Father stated that he stopped using marijuana after the children were taken into DCS custody and said he would not use

marijuana if the children came back into his custody. This was contrary to what Father told the various counselors he saw, including Mr. Bonds and Mr. Beyer. Father denied knowledge of any instances of domestic violence despite being presented with police reports from the incidents and denied having either a drug or alcohol addiction. Father testified he had not used illegal drugs since his children were born but was later presented with the results of a drug screen from June 2017 in which he tested positive for methamphetamine, which Father then admitted did qualify as an illegal drug. Father reported to Ms. Richardson as late as March 2017 that he was still seeing Mother daily and testified at trial that he "would marry her in a heartbeat" in order to reunite his family.

Mother testified the reason her children were removed from the home was domestic violence and substance abuse. Mother stated that she completed everything asked of her in the permanency plans with the exception of having failed multiple drug screens. Mother admitted that in the past two years, she has taken nine drug screens and passed only one of them. All of the other drug screens were positive for marijuana or THC, opiates or methamphetamine. Mother testified that at that this time, she does not have a relationship with Father. Mother stated that she is currently taking Effexor for depression, which her regular doctor prescribes. Mother is not currently seeing a psychiatrist. Mother denied any physical altercations with Father occurring since the children were born; however, Mother did admit that in May 2015, she held a knife to protect her older son Cody when Father and Cody were fighting. She also admitted to seeking an order of protection against Father in June 2016 after Father threatened her with a rifle. Mother testified that the foster parents take good care of her children.

In a written order entered on August 24, 2017, the circuit court found that DCS had proven the grounds of abandonment for failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistence of conditions as to both Parents and that termination was in the children's best interest. The circuit court terminated Mother and Father's parental rights to their children.

## ISSUES

Mother and Father timely appealed, raising the following issues which we have condensed and re-worded as follows:

1. Whether the circuit court erred by denying Father's motion to disqualify the guardian ad litem.
2. Whether the circuit court properly determined that grounds existed to support the termination of Mother's and Father's parental rights.
3. Whether the circuit court properly determined that termination of parental rights was in the children's best interest.

STANDARD OF REVIEW

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *In re F.R.R.*, 193 S.W.3d at 530 (quoting Tenn. R. App. P. 13(d)).

However, because of the heightened burden of proof in termination proceedings, this court must make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010). The trial court's ruling regarding whether the evidence sufficiently supported termination is a conclusion of law, which we review de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524.

## ANALYSIS

### I. GUARDIAN AD LITEM

Attorney Betty Scott was appointed as the children's guardian ad litem in the dependency and neglect case filed in Gibson County Juvenile Court. Thereafter, DCS filed a Petition to Terminate Parental Rights in Gibson County Circuit Court[3] and Ms. Scott was appointed to serve as the guardian ad litem in that case as well.

On May 10, 2017, Ms. Scott filed a motion to modify Parents' visitation in the juvenile court case. The basis for this motion was to cease all forms of contact between Parents and children until Parents consistently passed drug screens and otherwise complied with the permanency plan and demonstrated that Parents could rationally participate in non-confrontational meetings over a consistent period of time. But Ms. Scott also included in her motion the following statements about her personal observations:

> 3. Attorney Scott has **personally witnessed** the parents harassing foster parents before and after court.

---

[3] The termination petition was filed in circuit court while the dependency and neglect proceedings remained under the jurisdiction of the juvenile court.

10. That Mother had an Order of Protection against Father for several months. Subsequent to a juvenile court hearing last winter, while the Order of Protection was in effect, this Guardian Ad Litem specifically asked Mother if she drove Father to court that day. Although mother denied it, **this Guardian ad Litem observed** them driving from the parking lot together in Mother's vehicle.

(emphasis added).

On June 14, 2017, the juvenile court heard the guardian ad litem's motion to modify Parents' visitation and Father's motion to disqualify the guardian ad litem. In its order filed July 26, 2017, the juvenile court denied Father's motion, specifically noting the court would not "consider any allegations purported to be witnessed by the Guardian ad Litem." The court also found that suspending Parents' visitation was in the children's best interest "due to Father's admitted refusal to submit to drug screens, Mother's consistent positive drug screens, the parent's [sic] non-compliance with the Family Permanency Plan, and [Father's] volatile behaviors."

Meanwhile, on June 26, 2017, Father filed a motion to disqualify the guardian ad litem in the circuit court case, arguing that the guardian ad litem had inserted herself as a necessary witness in the dependency and neglect case. On August 4, 2017, the circuit court denied Father's motion to disqualify the guardian ad litem. In its order, the court determined that the guardian ad litem was not a "necessary witness" as required under Tennessee Supreme Court Rule 8, Rule of Professional Conduct 3.7(a) and therefore there was no need to disqualify Ms. Scott.

Father argues the circuit court erred when it failed to disqualify the guardian ad litem, claiming that the guardian ad litem began functioning as a "necessary witness" in the concurrent dependency and neglect action. The basis for this argument is that the guardian ad litem filed a motion to modify visitation in the juvenile court, supported, in part, by her personal observations of Father harassing the foster parents before and after court and witnessing Mother and Father riding in the same car when an order of protection was in place.

Rule of Professional Conduct 3.7(a) precludes a lawyer from acting as an advocate at trial when the lawyer is likely to be a "necessary witness." Tenn. R. Sup. Ct. Rule 8, RPC 3.7. However, the guardian ad litem did not testify in the termination proceedings. Admittedly, she proffered her own testimony via affidavits in support of a motion filed in the juvenile court dependency and neglect action that was a separate action in a different court. *See* Tenn. Code Ann. § 37-1-103(c); *see also In re Kaliyah S.*, 455 S.W.3d 533,

539 (Tenn. 2015) (holding that termination actions are distinct from dependency-and-neglect actions).

Admittedly, the guardian ad litem referenced in her motion to modify visitation in the dependency and neglect action that she personally witnessed two incidents of noncompliance; however, in making its ruling, the juvenile court prohibited the guardian ad litem from testifying in support of her motion and struck any allegations from the motion that the guardian ad litem purportedly witnessed. The court instead relied upon a plethora of other evidence – specifically, the testimony of both Parents, two DCS case workers, Youth Villages counselor David French, the foster parents, as well as exhibits and the record as a whole – in granting the guardian ad litem's motion to suspend Parents' visitation and denying Father's motion to disqualify the guardian ad litem. Father's inability to cross examine the guardian ad litem on her two noted observations was harmless. Not only were there multiple witnesses to those observations, but there was additional evidence to substantiate the circuit court's order to terminate parental rights. As such, the guardian ad litem was not a "necessary witness" under Tennessee Supreme Court Rule 8, Rule of Professional Conduct 3.7(a).

As for the termination action, we find it significant that had Father not filed a separate motion to disqualify the guardian ad litem in the termination proceeding, the circuit court would not have been aware that the guardian ad litem personally witnessed Father's non-compliance.

Father also argues that the circuit court erred by permitting the guardian ad litem to operate as an "unrestricted" Rule 40A guardian. There are two Tennessee Supreme Court Rules that apply to guardians ad litem: Rule 40 and Rule 40A.

Tennessee Supreme Court Rule 40 sets forth the powers of guardians ad litem appointed by the juvenile court in neglect, abuse, and dependency proceedings. Tenn. Sup. Ct. R. 40(a); *Runyon v. Zacharias*, __ S.W.3d. __No. W2016-02141-COA-R3-CV, 2018 WL 526712, at *7, n. 3 (Tenn. Ct. App. Jan. 23, 2018), appeal denied (May 17, 2018) ("Rule 40 only applies to 'neglect, abuse and dependency proceedings' in juvenile court.").

Guardians appointed under Rule 40 have broad authority to perform any activities that could be expected of any attorney participating in a trial, including petitioning the court on the child's behalf, participating in formal discovery, making opening statements and closing arguments, examining witnesses in court, filing briefs and legal memoranda, and preparing and submitting proposed findings of fact and conclusions of law. Tenn. Sup. Ct. R. 40(d). Here, the guardian ad litem's motion to modify visitation was filed in the juvenile court in compliance with Tennessee Supreme Court Rule 40.

Tennessee Supreme Court Rule 40A applies to custody proceedings. *See* Tenn. Sup. Ct. R. 40A § 3(a); *see also Runyon*, 2018 WL 526712, at \*3 ("Rule 40A authorizes the trial court presiding over a custody proceeding to appoint an attorney as a guardian ad litem"). Before the rule was amended in 2011, a guardian ad litem's role was more limited. For example, they could not "make opening and closing statements or examine witnesses in court." *In re Jonathan S. C-B*, No. M2010-02536-COA-R3-JV, 2012 WL 3112897, at \*21 (Tenn. Ct. App. July 31, 2012). It appears Father has relied on this previous version of Rule 40A in arguing that the circuit court erred here by designating the guardian ad litem as "unrestricted."

Rule 40A specifies that "the guardian ad litem now functions as a lawyer, not as a witness or special master," Tenn. Sup. Ct. R. 40A, § 9 (Commentary), and may "take any action that may be taken by an attorney representing a party pursuant to the Rules of Civil Procedure." Tenn. Sup. Ct. R. 40A, § 9(b), *Potter v. Paterson*, No. E2013-01569-COA-R3-CV, 2014 WL 2442776, at \*7 (Tenn. Ct. App. May 28, 2014). Therefore, the circuit court was well within its discretion to designate the guardian ad litem in this case as "unrestricted" under Rule 40A.

## II.    GROUNDS FOR TERMINATION

### A.  Abandonment by Failure to Provide a Suitable Home

Abandonment is a statutory ground for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as

> The child has been removed from the home of the parent or parents … as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child … and the child was placed in the custody of the department or a licensed child-placing agency … and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents … to establish a suitable home for the child, but that the parent or parents … have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent … in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent … toward the same goal, when the parent … is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(a)(ii). In order for a home to be considered suitable, a parent or guardian must provide more than an appropriate physical dwelling structure. *In*

- 13 -

*re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014). The home must also be free from drugs and domestic violence. *Id.* A parent's compliance with counseling requirements is also "directly related to the establishment and maintenance of a suitable home." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016) (quoting *In re M.F.O.*, No. M2008–01322–COA–R3–PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)).

The circuit court found that DCS made reasonable efforts to assist both Mother and Father with establishing a suitable home for the children. Further, the circuit court found that Mother and Father have made no reasonable efforts to provide a suitable home and that a suitable home will likely not be provided in the near future. In its order, the court stated:

> [T]he parents continue to use drugs, and fail to acknowledge, much less address, the underlying issues of anger and domestic violence which caused the children to be removed from their home. [Mother] has failed 8 drug screens for various drugs including marijuana, codeine, and methamphetamine; passed one drug screen; and refused to submit to 4 drug screens since the children have been in DCS custody. [Father] has failed 5 drug screens for marijuana; on June 30, 2017, failed for Methamphetamines drug screens and marijuana; and has refused five during the time the children have been in DCS custody. [Father] refuses to acknowledge the domestic violence incidents between him and [Mother] that have occurred since the children were born. [Mother] has acknowledged to various people the abusive relationship that occurred prior to the children being removed and the incidents since then but she has minimized or failed to address those issues in counseling or even at today's hearing.

The circuit court went on to comment that the domestic violence issues with Parents are still ongoing, and that Parents have not been forthcoming about their continued drug use. Specifically, the circuit court noted it was "concerned with [Father's] adoration of marijuana and his continuing pattern of irrational angry outbursts," and went on to say

> The children have been in the custody of [DCS] for approximately 24 months and during that time the parents have made little to no efforts to change the conditions in their lives or homes to enable to allow the children to return to their home despite reasonable efforts from [DCS] to assist them to do so. The children are in a safe and stable home with their foster parents and a change in caregivers would be detrimental to them.

We agree with the circuit court's finding that DCS made reasonable efforts to assist Mother and Father in establishing a suitable home for the children and that Mother and Father failed to provide a suitable home for the children. *See* Tenn. Code Ann. § 36-1-113(g)(1). Therefore, we have determined that DCS established this ground for termination by clear and convincing evidence.

## B. Substantial Non-Compliance with Permanency Plans

We next consider whether DCS presented clear and convincing evidence to support the ground of substantial non-compliance with the permanency plans. This ground is met when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. 36-1-113(g)(2). To establish substantial noncompliance, the court must initially find "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place," *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004); *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002), and second, that the parent's noncompliance is substantial. *In re S.H.*, No. M2007–01718–COA–R3–PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008) (no Tenn. R. App. P. 11 application filed). Mere technical noncompliance does not justify the termination of parental rights. *In re Valentine*, 79 S.W.3d at 548. The noncompliance must be weighed in light of the degree of noncompliance and the importance of the requirement not met. *Id.* at 548-549.

The initial permanency plan required that Parents (1) complete a mental health intake and follow recommendations; (2) sign releases with providers; (3) complete counseling to specifically address domestic violence issues and follow recommendations; (4) refrain from domestic violence; (5) have a safe and stable residence; (6) refrain from illegal drug use and seek medical care not requiring illegal drug use; (7) have valid prescriptions for any medications they are taking and complete pill counts; (8) complete alcohol and drug assessments and complete recommended treatment and services; (9) submit to random drug screening and pass all screens with negative results; (10) provide DCS with names and contact information for any relatives who may be willing to care for the children; and (11) complete parenting assessments and any recommended counseling or parenting education. The plan was revised to add that (12) Father not put the children in the car after visits; (13) Parents refrain from discussing the case with the children; (14) complete a psychological evaluation with a parenting component and follow recommendations; (15) complete the specific treatment recommendations of their psychological evaluations; and (15) participate in services with Youth Villages to address positive parenting skills. These goals were reasonably related to helping Mother and Father address their drug abuse and domestic violence issues in order to provide a safe and stable home environment for their children. Mother signed all of the plans and participated in their development. Father signed and participated in the first two plans but declined to participate in the April and June 2016 revisions.

- 15 -

Despite nearly two years of services and support from DCS, Parents made virtually no progress toward addressing their issues with domestic violence, mental health, and drug abuse, demonstrating such a lack of concern for the welfare of their children that these conditions are unlikely to be remedied at an early date. *See In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000) ("Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified.")

Parents failed to comply with the plans' mental health requirements. Neither Parent attended counseling more than sporadically until October 2016 - the month prior to DCS's November 2016 termination petition - and even then, their attendance was infrequent or intermittent. When they did meet with treatment providers, Parents were evasive and consistently failed to disclose the extent of their drug use and histories for domestic violence. Neither Parent completed the treatment recommended by their psychological evaluations.

Parents also failed to comply with those requirements addressing their issues with drug abuse. Other than one negative drug screen in the summer of 2016, Mother consistently tested positive for marijuana and methamphetamine. She refused four screens — including three of her last four — and failed her most recently completed screen in February 2017 for methamphetamine, amphetamine, and marijuana. Father refused at least five screens and otherwise consistently tested positive for marijuana and benzodiazepines, for which he never provided a prescription. On June 30, 2017 — less than a month before trial — he failed for methamphetamine and THC.

The circuit court found that the requirements of the permanency plans were reasonable and related to the issues necessitating foster care. Parents signed the Criteria & Procedures for Termination of Parental Rights, which explained that failure to comply with the permanency plans was grounds for termination, but they accomplished virtually none of the plans' requirements. Accordingly, we find clear and convincing evidence in the record which supports the circuit court's conclusion that Parents failed to substantially comply with the requirements of the permanency plans.

## C. Persistence of Conditions

We next consider whether the circuit court erred in finding clear and convincing evidence to support the ground of persistence of conditions. This ground for termination occurs when

[t]he child has been removed from the home of the parent or guardian by

- 16 -

order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

Tenn. Code Ann. §36-1-113(g)(3).

Here, the children were removed from the home in July 2015 and adjudicated dependent and neglected on September 16, 2015; therefore this ground is clearly applicable. The circuit court noted in its findings of fact that,

[t]he children have been in the custody of [DCS] for approximately 24 months and during that time the parents have made little to no efforts to change the conditions in their lives or homes to enable to allow the children to return to their home despite reasonable efforts from [DCS] to assist them to do so. The children are in a safe and stable home with their foster parents and a change in caregivers would be detrimental to them.

Further, the circuit court determined that the children have been removed from Parents for more than six months, the conditions which led to their removal would likely subject the children to further abuse or neglect, and that there was little likelihood that the conditions would be remedied in the near future in order to safely return the children to Parents' custody. Tenn. Code Ann. §36-1-113(g)(3).

As previously discussed, the reasons for removing the children from Parents' custody were drug abuse and domestic violence. Father's counselor Alvin Bonds testified that Parents' relationship was unhealthy and that it was a positive that they were no longer together. Another counselor, Mr. Beyer, testified that Parents' relationship did not seem healthy because of the pattern of conflict between the two. As late as March 2017, Mother reported to her counselor, Ms. Goodrich, that Father was harassing and stalking her. That same month, Father reported to Ms. Richardson that he was still seeing Mother daily, and even testified at trial that he "would marry [Mother] in a heartbeat" in order to reunite his family. It is clear from the record that both Parents downplay the recurring domestic violence issues, and there is little likelihood this condition would be remedied in the near future. *See* Tenn. Code Ann. §36-1-113(g)(3).

Regarding their drug use, the circuit court was concerned about what it characterized as Father's "adoration of marijuana." Father told Mr. Bonds that he was not willing to stop using cannabis or marijuana, despite the counselor advising Father that the drug could impact Father's ability to focus and detrimentally affect his ability to parent. In the past two years, Father has not had a single negative drug screen, refusing several of the tests. Mother admitted that in the past two years, she took nine drug screens and passed only one of them. All of the other drug screens were positive for marijuana or THC, opiates, or methamphetamine.

It is clear from the evidence presented that Parents were given numerous opportunities and resources through DCS to receive counseling and pass random drug screens with negative results. Despite this, throughout a two-year period both Parents consistently tested positive for illegal drugs, and hence the conditions that led to the children's removal still persist. *See* Tenn. Code Ann. §36-1-113(g)(3). Thus we agree that the evidence supports the circuit court's ruling on this ground for termination.

### III.    BEST INTEREST

After at least one ground for parental termination has been established by clear and convincing evidence, the court must determine whether termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(1)–(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). In making that determination, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Our legislature has identified nine statutory factors for the court to consider in conducting a best-interests analysis. They include:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child

or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court does not have to find the existence of each of these nine factors before it may conclude that termination is in the child's best interest. *In re Navada N.*, 498 S.W.3d 579, 607 (Tenn. Ct. App. 2016). "Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis." *Id.* However, as the Tennessee Supreme Court recently held,

> this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). Neither is the trial court required to total up each of the factors and determine whether the sum of them weighs in favor or against the parent. *In re Audrey S.,* 182 S.W.3d at 878. "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

Here, the circuit court found that Parents

> have failed to make such an adjustment of circumstance, conduct, or condition as to make it safe and in the child's best interests to be in the home of the parent or guardians. [Factor 1] The parents have failed to effect a lasting adjustment after reasonable efforts by DCS and it does not appear possible that a lasting adjustment will occur. [Factor 2] They have failed to accept responsibility for the situation as it is now. The parents did not take visitation as seriously as they should have and the children's behaviors

- 19 -

have improved since the visitation has been terminated. [Factor 3] The parents continue to test positive for illegal drugs that render them unable to care for the child in a safe and stable home. [Factor 7] A change in caregivers and physical environment is likely to be detrimental to the children as they are doing well in the home of their foster parents who wish to adopt them. [Factor 5]

As the circuit court's order reads, five of the nine statutory best interest factors weigh in favor of terminating Mother's and Father's parental rights. Two factors weigh against terminating Parents' rights, those being a meaningful relationship established with the children (Factor 4) and child support consistently paid (Factor 9). Two other factors are clearly applicable but were not addressed in the circuit court's order: whether Parents have shown brutality, physical, or psychological abuse toward another adult in the household (Factor 6) and whether Parents' mental and/or emotional status would be detrimental to the children or prevent Parents from effectively providing safe and stable care and supervision for the children (Factor 8). Tenn. Code Ann. § 36-1-113(i).

Although Parents made some effort to complete goals of the permanency plan by paying child support as ordered, attending counseling sessions sporadically, and visiting regularly with the children, DCS's main concerns with Parents were domestic violence and drug abuse, neither of which Mother or Father ever adequately addressed. Parents continued to test positive for illegal substances over a two year period leading up to trial. One of Father's counselors testified Father told him he had no desire to quit using cannabis or marijuana, despite advice to the contrary. Both Parents made excuses for their various positive drug screen results; Mother blamed peer pressure from working in a bar, and Father maintained he had a single moment of weakness when visiting with an old friend. The circuit court used the word "adoration" to describe Father's relationship with marijuana. Regarding domestic violence, counselors for both Mother and Father testified Parents downplayed or denied the existence of domestic violence in the home. However, other testimony from counselors, the foster mom, and DCS workers affirmed the ongoing issues with Parents' relationship.

It is clear that in making this finding, the circuit court examined the nine statutory best interest factors, and found that terminating Mother and Father's parental rights was in the children's best interest. The record fully supports this finding. Therefore, we affirm the circuit court's decision that terminating Mother and Father's parental rights was in the best interest of the children.

**IN CONCLUSION**

The judgment of the circuit court is affirmed, and this matter is remanded with costs of appeal assessed equally against the appellants, Jamie W. and Michael B.

_____
FRANK G. CLEMENT JR., P.J., M.S.